# 17-3510

## United States Court of Appeals for the Second Circuit

———————

NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,
DEFENDANT-COUNTER-CLAIMANT-APPELLANT

———————

## NFLPA'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND FOR AN EXPEDITED APPEAL

———————

On Appeal From The United States District Court
For The Southern District Of New York
Case No. 17-cv-6761-KPF

———————

[*counsel listed on inside cover*]

Jeffrey L. Kessler
David L. Greenspan
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

Steffen N. Johnson
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000

DeMaurice F. Smith
NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
1133 20th Street, N.W.
Washington, D.C. 20036
(202) 756-9136

Andrew S. Tulumello
  *Counsel of Record*
Thomas H. Dupree, Jr.
Christopher J. Baum
Jason E. Neal
Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
atulumello@gibsondunn.com

Rebekah Perry Ricketts
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, TX  75201
(214) 698-3100

*Counsel for National Football League Players Association
and Ezekiel Elliott*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant National Football League Players Association hereby certifies that it is a non-profit corporation organized under the laws of the Commonwealth of Virginia, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE ..............................................................2

STANDARD OF REVIEW ...................................................................6

ARGUMENT ......................................................................................7

I.     Elliott Will Suffer Irreparable Harm Absent An Injunction Pending Appeal. ..........................................................................................7

II.    NFLPA Has Made A Strong Showing Of Likelihood Of Success On The Merits. ...................................................................................10

    A.  Vacatur Is Appropriate Under The LMRA When The Arbitrator Excluded "Pertinent And Material" Evidence. ...........................10

    B.  The District Court's Assessment Of The NFLPA's Likelihood Of Success Was Both Wrong And Infected With Legal Error. .....................13

        1.  The NFLPA And Elliott Were Denied The Opportunity To Present "Pertinent And Material" Evidence. .......................................13

        2.  The District Court's Errors Of Law Independently Establish The NFLPA's Likelihood Of Success On The Merits. ...........................18

III.   The Public Interest Favors An Injunction Pending Appeal. ..........................21

CONCLUSION .................................................................................22

# INTRODUCTION

Absent expedited relief from this Court, a deeply flawed arbitral decision will go into immediate effect, irreparably injuring the reputation and career of a young professional football player. Irreparable harm is demonstrable. And likelihood of success—and the raising of serious questions—even more so. Within a few days, two district courts in this Circuit reached starkly conflicting decisions in this case. On October 17, Judge Crotty sided with two other federal judges in this case—Judge Mazzant of the Eastern District of Texas and Judge Graves of the Fifth Circuit—in holding that the National Football League Players Association ("NFLPA") and Ezekiel Elliott were entitled to emergency relief from a threatened six-game suspension. On October 30, Judge Failla held the opposite, denying NFLPA's motion for preliminary injunction—and breaking with a long line of federal authority holding that "[i]mproper suspensions can undoubtedly result in irreparable harm." Ex.C.2. Absent this Court's intervention, Judge Failla's erroneous decision will effectively become the final word before Elliott serves his entire suspension.

The NFLPA also respectfully requests an administrative stay during the pendency of this motion that would enable Ezekiel Elliott to play his regularly scheduled game on **Sunday, November 5,** in the event the motion cannot be decided on the merits before then.

## STATEMENT OF THE CASE

Ezekiel Elliott is the promising 22-year-old running back for the Dallas Cowboys, now playing his second season in the NFL, after winning First-Team All-Pro Honors in his debut season.  He was picked fourth overall in the 2016 NFL draft. As an active professional football player, he is a member of the NFLPA, which advocates for and defends the rights of players on issues ranging from player safety, retirement and long-term care, financial literacy, salary and benefits, and player discipline issues.

In 2016, police officers in Columbus, Ohio began investigating allegations made by Tiffany Thompson that Elliott used force against her during the week of July 16, 2016.  Elliott, who has no criminal record, was never arrested or charged, and he has consistently denied that he committed any wrongful acts toward Thompson.  The Columbus police refused to arrest or charge Elliott because Thompson's claims constituted "conflicting version[s] of what had taken place." Ex.I.2.  After an extensive investigation, the Columbus City Attorney's office announced that it would not charge Elliott due to the "conflicting and inconsistent information across all incidents," including information from Thompson, the sole eyewitness to all of the alleged acts.  Ex.J.

Pursuant to a new Personal Conduct Policy issued by Commissioner Goodell in 2016, in which Goodell authorized private League investigators to conduct after-

the-fact investigations of non-criminal, off-field activity to determine if workplace punishment is warranted, the NFL undertook its own exhaustive 14-month investigation of Thompson's allegations, led by NFL Director of Investigations Kia Roberts, a veteran domestic-violence prosecutor. Roberts conducted 22 separate witness interviews, including six separate interviews of Thompson.

Roberts found that Thompson had significant credibility issues: Thompson repeatedly lied to the investigators; she told her friend to lie to police and to fabricate claims that Elliott had used force on her; she gave contradictory and inconsistent accounts of the alleged incidents; she intentionally destroyed relevant evidence from her cell phones; she attempted to extort money from Elliott; and she publicly threatened to ruin Elliott's career, telling Elliott that because she was a white woman and he was a black athlete, "no one is going to believe you." Ex.S.115:3–4; *see* Ex.K.61-63, 66-67; Ex.R (Aug. 29) 297:13, 241:25-242:2. Only one of Thompson's friends spoke with Roberts, and that friend contradicted Thompson and admitted that Thompson had coached her to lie. Roberts ultimately concluded that there was insufficient evidence to support discipline of any sort against Elliott. Ex.R (Aug. 30) 301:22-302:4.

Although issues of Thompson's credibility were described in the Report that was sent to Commissioner Goodell, the co-lead investigator, NFL Senior Vice President Lisa Friel, decided that Roberts's assessment and evaluation of the

3

evidence would not be included in the Report. Ex.R (Aug. 30) 265:15-266:17; *see* Ex.G.58:14-18. Then Friel—without Roberts—attended meetings with the Commissioner and his expert advisors to present their findings. Ex.R (Aug. 29) 161:16-22; 163:11-13. Roberts's determination that there was insufficient evidence that any misconduct took place was never communicated to Goodell or his advisors. Ex.G.58:14-1.

On August 11, 2017, Commissioner Goodell suspended Elliott for six games, purportedly for committing three of the alleged five incidents. Ex.L.3-6. The Commissioner also publicly directed him to seek "counseling." Elliott appealed under the CBA's procedures, with arbitrator Harold Henderson presiding. The NFLPA requested that the NFL make Thompson available for questioning and, after the NFL refused, moved Henderson to compel Thompson for cross-examination. Henderson denied the motion. Exs.N, O, & P. The NFL also opposed producing Roberts for cross-examination, claiming that her testimony would be "cumulative," but Henderson compelled the NFL to produce Roberts. Ex.P.2.

Roberts's testimony revealed her assessment of the evidence, including that "[i]t seemed like there were numerous witnesses" whose testimony was "diametrically opposed to what [Thompson] stated had occurred," and that in her nine-year career as a (former) prosecutor, Roberts had never "cho[sen] to put a witness on the stand knowing that they had this many inconsistencies in their

4

testimony." Ex.R (Aug. 29) 172:24, 173:19-22; 226:21-25. As Friel later testified on cross-examination, Roberts's belief that there was insufficient evidence to support any discipline was never disclosed to the Commissioner or his advisors. Ex.R (Aug. 30) 301:22-302:4. Accordingly, the NFLPA sought to compel the Commissioner's testimony about the extent of *his* knowledge regarding his lead investigator's findings before he suspended Elliott. The NFLPA contended that the arbitrator could not defer to the Commissioner's findings if Goodell lacked this critical information from Roberts. Henderson refused to compel Goodell to testify.

Threatened by an imminent suspension, Elliott moved in the Eastern District of Texas to preliminarily enjoin the Arbitrator's award. That court granted the motion, finding that Elliott "did not receive a fundamentally fair hearing," and explaining that these facts "are everything but ordinary and are such that the denial of key witnesses and documents amounts to serious misconduct by the arbitrator." Ex.D.1, 15. The NFL then sought an emergency stay in the Fifth Circuit. On October 12, the panel majority dismissed the case for lack of subject-matter jurisdiction, while acknowledging that Elliott's "arguments and concerns about the arbitration process may have merit." Ex.F.9 n.8. Judge Graves dissented, explaining that the award resulted from "an arguably unfair process" that "impugned the integrity of the arbitration process." Ex.F.19 (internal quotation marks omitted).

5

Meanwhile, the NFL moved to affirm the award in the Southern District of New York. Elliott counterclaimed to vacate the award. On October 17, Judge Crotty granted Elliott a temporary restraining order, finding that Elliott "was deprived of opportunities to explore pertinent and material evidence." Ex.C.3. On October 30, Judge Failla denied Elliott's motion for a preliminary injunction and dissolved the TRO. Ex.B. On October 31, Judge Failla further denied Elliott's emergency motion for an injunction pending appeal, Ex.A.

## STANDARD OF REVIEW

Whether to grant an injunction pending appeal depends on (1) whether the applicant "has made a strong showing that he is likely to succeed on the merits"; (2) whether the applicant will be "irreparably injured" absent an injunction; (3) whether issuing the injunction "will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). In the context of an injunction pending appeal, these criteria are applied on a "sliding scale," such that the "probability of success" may be "inversely proportional" to the amount of irreparable injury that will occur absent the injunction. *Thapa v. Gonzalez*, 460 F.3d 323, 334–35 (2d Cir. 2006). "[M]ore of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002).

## ARGUMENT

## I. Elliott Will Suffer Irreparable Harm Absent An Injunction Pending Appeal.

This case presents the starkest possible case for irreparable harm. Professional football players, and running backs in particular, have an average career span of less than 4 years. Given the very limited window in which these athletes can practice their profession, the ever-looming threat of injury, and the ruthlessly meritocratic link between on-field performance and pay, courts have consistently concluded that professional athletes suffer irreparable harm when threatened with a potentially wrongful suspension. *See, e.g., Haywood v. NBA*, 401 U.S. 1204, 1205 (1971) (reinstating district court decision finding that, if player "is unable to continue to play professional basketball, . . . he will suffer irreparable injury in that a substantial part of his playing career will have been dissipated") (Douglas, J., in chambers); *NFLPA v. NFL* ("*Starcaps*"), 598 F. Supp. 2d 971, 982 (D. Minn. 2008) (player suffered irreparable harm where he would "los[e] playing time," and "his reputation may be irretrievably tarnished").[1] Indeed, no court—until the district

---

[1] *See also Silverman v. MLB Player Relations Comm., Inc.*, 67 F.3d 1054, 1062 (2d Cir. 1995) (same); *Mackey v. NFL*, 543 F.2d 606, 623 (8th Cir. 1976) (same); *Clarett v. NFL*, 306 F. Supp. 2d 411, 412 (S.D.N.Y. 2004) (same); *Jackson v. NFL*, 802 F. Supp. 226, 231 (D. Minn. 1992) (same); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319 (D. Conn. 1977) (same); *Bowman v. NFL*, 402 F. Supp. 754, 756 (D. Minn. 1975) (same); *Prof'l Sports, Ltd. v. Virginia Squires Basketball Club Ltd. P'ship*, 373 F. Supp. 946, 949 (W.D. Tex. 1974) (same).

court below—had *ever* held that professional athletes facing short career spans do not face irreparable harm in this context.

The district court acknowledged that the balance of harms presents a "close[] question," Ex.B.20, but refused—with no meaningful explanation—to follow the "long line of cases that have previously held that improper suspensions of professional athletes can result in irreparable harm to the player." Ex.D.19; *see also* Ex.C.2. The district court's irreparable harm analysis is wrong on the law and on its own terms for at least three reasons.

*First*, and contrary to the district court's determination, the NFL correctly conceded at the preliminary injunction hearing that Elliott will suffer irreparable harm in the absence of an injunction. Ex.G.39:8-13 ("The missing of the games, that is a species of the irrep[a]rable injury."); *see also id.* at 41:13-21. That concession accords with numerous cases making clear that in professional sports— where careers are "short and precarious," Ex.D.19—"lost playing time . . . constitutes irreparable harm," full stop. *Brady v. NFL*, 779 F. Supp. 2d 992, 1035 (D. Minn. 2011), *vacated on other grounds*, 644 F.3d 661 (8th Cir. 2011).

*Second*, after the suspension first took effect in September 2017, and before any court had enjoined the award, the NFL actually allowed Elliott to play in Game One of the NFL season, conduct inconsistent with its claim that a deferred suspension causes the League irreparable harm. The law does not recognize a harm

that is freely self-imposed as irreparable—let alone sufficiently "irreparable" to prevail under a balance-of-hardships test. Accordingly, contrary to the district court's conclusion, the NFL's "interest in obtaining the benefit of its bargain" cannot possibly prevail in the balance of the equities and stand in the way of an injunction pending appeal. Ex.B.23.

*Third*, the district court erroneously held that Elliott's injuries were simply "future economic injuries such as lost profits [that] are compensable through monetary awards." *Id.* at 21. No court has ever taken that approach. And the significant monetary losses that Elliott will suffer due to the threatened six-game suspension cannot be calculated because of the effects of that suspension on Elliott's reputation, earning potential, and overall market value. Arceneaux Decl. ¶ 10.4; *see, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012). Importantly, that the *amount* of the irreparable harm is not quantifiable at this stage does not mean that the *occurrence* of irreparable harm is speculative, as the district court appeared to assume. Indeed, as the one case relied on by the district court recognized, "irreparable harm exists . . . where there *is* a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (emphasis added). That is obviously the situation here.

Further, the district court surmised that the "lessened likelihood of a team's success resulting from a player's suspension" is not "personalized to the player."

9

Ex.B.22 n.6. That is wrong. If the Cowboys do not qualify for the playoffs, Elliott indisputably will lose any opportunity to set single-game or single-season rushing records, or secure post-season awards such as Super Bowl MVP, or increase his market value by contributing to his team's late-season and post-season success. All these reasons demonstrate why the NFL freely conceded that Elliott would suffer irreparable harm—a point that the district court nonetheless rejected.

In light of all this, the balance of hardships here is clear: Absent an injunction pending appeal, Elliott will suffer irreparable harm. He will be suspended *immediately* without any ability to stay on the field, even if he ultimately prevails below. The NFL will suffer none.

## II.    NFLPA Has Made A Strong Showing Of Likelihood Of Success On The Merits.

### A.    Vacatur Is Appropriate Under The LMRA When The Arbitrator Excluded "Pertinent And Material" Evidence.

The NFLPA also has made a strong showing of success on the merits. While this Court's review of an arbitration award is "limited" and deferential, *see United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987), that deference "is not the equivalent of a grant of limitless power." *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990). In particular, in determining whether to vacate an arbitration award, courts "loo[k] to the [Federal Arbitration] Act for guidance in labor arbitration cases" under the Labor

10

Management Relations Act ("LMRA"). *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 n.9 (1987). That is "especially" true because Section 301 of the LMRA "empowers the federal courts to fashion rules of federal common law to govern suits for violation of contracts between an employer and a labor organization under the federal labor laws." *Misco*, 484 U.S. at 40 n.9.

Under the FAA, courts may vacate arbitration awards "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).[2] This standard has been deeply ingrained in the law of arbitration—and enshrined in the text of the FAA—since the statute was first enacted in 1925. United States Arbitration Act, Pub. L. No. 68-401, § 10(c) (Feb. 12, 1925) (codified as amended at 9 U.S.C. § 1 *et seq*.). This Court has *held* that under Section 10(a)(3) arbitration determinations will "be opened up to evidentiary review"—such that vacatur is appropriate—"where fundamental fairness is violated." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir.

---

[2] "Misconduct" here means not bad faith, "but misbehavior, *though without taint of corruption or fraud*, [which] may be born of indiscretion." *Stefano Berizzi Co. v. Krausz*, 146 N.E. 436, 437 (N.Y. 1925) (emphases added) (Cardozo, J.); *see Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968). That is why corruption, fraud, and partiality—*i.e.*, bad faith—are addressed in separate subsections of the statute. 9 U.S.C. § 10(a)(1); *id.* § 10(a)(2).

11

1997). This "fundamental fairness" requirement accords with pre-FAA arbitration precedent stretching back more than 150 years. *See*, *e.g.*, *Burchell v. Marsh*, 58 U.S. 344, 349 (1854).

This Court has also expressly held that *in an LMRA case* arbitrators must "grant the parties a fundamentally fair hearing." *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974) (citing 9 U.S.C. § 10(c) (now 9 U.S.C. § 10(a)(3)). And multiple courts of appeals have vacated arbitration awards in LMRA cases for fundamental unfairness. *See*, *e.g.*, *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 42 (1st Cir. 1985); *see also Carpenters 46 N. California Ctys. Conference Bd. v. Zcon Builders*, 96 F.3d 410, 413 (9th Cir. 1996) (stating in LMRA case that arbitrator must "grant the parties a fundamentally fair hearing").

Despite all this, the district court suggested that courts should not review LMRA awards for fundamental fairness. Ex.B.15-17. The district court's view—that LMRA awards are immune from judicial review for procedural fairness—cannot be squared with the decades of precedent in LMRA cases discussed above. And the district court's warnings of calamitous consequences (Ex.B.17) ignore that the standard for vacating for fundamental unfairness is not "free-floating" but firmly

grounded in the text of the FAA, and has been a basis for vacatur for nearly a century.[3]

Fundamental fairness review is also necessary. The integrity of the arbitral process is presumed by the law, which is why arbitral awards are presumptively entitled to collateral estoppel. *See*, *e.g.*, *Fuller v. Interview, Inc.*, No. 07-cv-5728, 2014 WL 2601376, at *5 (S.D.N.Y. May 14, 2014). The NFL's process here could have significant adverse collateral estoppel effects for Elliott in future proceedings.

## B. The District Court's Assessment Of The NFLPA's Likelihood Of Success Was Both Wrong And Infected With Legal Error.

Had the district court fully embraced fundamental fairness review, it would have easily concluded that this is a textbook case for vacatur under *Tempo Shain*.

### 1. The NFLPA And Elliott Were Denied The Opportunity To Present "Pertinent And Material" Evidence.

Judge Mazzant observed that "[t]he circumstances of this case are unmatched by any case this Court has seen." Ex.D.18. "Fundamental unfairness [was] present throughout the entire arbitration process," because "[a]t every turn, Elliott and the NFLPA were denied the evidence or witnesses needed to meet their burden."

---

[3] The NFLPA respectfully disagrees with the dicta in *Brady II* on which the district court relied, where this Court stated that it "ha[s] never held that the requirement of 'fundamental fairness' applies to arbitration awards under the LMRA." Ex.B.16 (quoting *NFL v. NFLPA*, 820 F.3d 527, 545 n.13 (2d Cir. 2016) ("*Brady II*")). *But see Bell Aerospace*, 500 F.2d at 923. At best, *Brady II* establishes that the issue is open in this Circuit.

Ex.D.19; *see also* Ex.C.3 (Elliott "was deprived of opportunities to explore pertinent and material evidence").

*First*, Arbitrator Henderson excluded "pertinent and material" evidence when he denied the NFLPA and Elliott the opportunity to examine Tiffany Thompson, the NFL's key witness, and the *sine qua non* of the investigation and discipline. If Thompson is lying, there is nothing here but an extraordinary power play by the Commissioner to suspend a player who is completely innocent of wrongdoing.

An individual's right to cross-examine the witnesses against him has "ancient roots," and "is *an essential and fundamental requirement*" for a "fair trial." *Pointer v. Texas*, 380 U.S. 400, 405 (1965) (emphasis added). This is not merely a criminal law concept, as the NFL has suggested. *See Piccolo v. CFTC*, 388 F.3d 387, 391 (2d Cir. 2004) ("Fundamental fairness requires a fair trial in a fair tribunal, with fair notice of the matters at issue and an opportunity to cross-examine witnesses.").

Here, both the NFLPA and Elliott requested an opportunity to question Thompson, whom they never had a chance to interview or examine on their own about these incidents. Henderson denied that request because he was "not persuaded that under the provisions of Article 46 the NFL is required to produce Thompson for testimony at the hearing." Ex.P.1. That decision was premised on Henderson's conclusion that he did not "believe [Thompson's] live testimony and availability for cross examination are *essential to Elliott's defense*," because "the Commissioner's

decision" was based on "affidavits, statements and interview reports, all of which are available to Elliott." *Id*. (emphasis added). But Thompson "was *the only witness to any alleged domestic violence*." Ex.F.19 (emphasis added). Elliott's right to cross-examine his lone accuser thus could not be more "material and pertinent."

*Second*, Henderson also excluded "pertinent and material" evidence when he refused to compel Commissioner Goodell to testify, thereby depriving the NFLPA and Elliott of the opportunity to prove that the Commissioner's decision was based on materially incomplete information. *See* Ex.C.3 (Elliott "was denied the opportunity to question NFL Commissioner Goodell regarding whether he was aware that the accuser of domestic violence was not credible").

Henderson expressly *deferred* to Commissioner Goodell's fact-finding, concluding that it was "*unnecessary* to reexamine all the evidence presented in this record" because "the record contains sufficient credible evidence to support whatever determinations" the Commissioner made. Ex.L.4 (emphasis added). Henderson therefore concluded that the Commissioner "is entitled to deference on those judgments." *Id.*

But the Commissioner himself was obviously presented with a skewed and incomplete version of the facts. The NFL's lead investigator, Kia Roberts, conducted every witness interview (except one of Elliott's interviews)—including *six* separate interviews with Thompson. After completing all 22 witness interviews,

15

Roberts concluded that "there was not sufficient evidence that was corroborating of Miss Thompson" to support any discipline of Elliott. Ex.R (Aug. 30) 301:22–302:4. As the NFL concedes, this crucial conclusion was not disclosed to Commissioner Goodell or his panel of expert advisors. Ex.G.58:14-18. Roberts was inexplicably excluded from the meeting with the Commissioner and his advisors, and she "did not meet with Commissioner Goodell to talk about [the] interviews" with Thompson. Ex.R (Aug. 29) 161:16–22, 163:11–13. The Report that Roberts and Friel produced to summarize their findings—contrary to typical practice for NFL investigative reports—did not include "any recommendation as to whether a violation of the Policy should be found." *Id.* at 265:15–21.

Critically, Henderson made no finding that Commissioner Goodell was aware of Roberts's evidentiary assessments—but he still deferred to "*whatever* determinations" the Commissioner made. Ex.L.4 (emphasis added). The Commissioner acknowledged the NFLPA's concerns with Thompson's credibility, but ultimately concluded that "the photographic and medical forensic evidence corroborates many critical elements" of Thompson's allegations. Ex.L.4. Because that determination was made based on a materially incomplete picture of the investigation, there was simply no basis for Henderson's unquestioning deference to the Commissioner.

That is why Judge Mazzant concluded that because "the evidence that was in front the Commissioner still remains unclear, it is material and pertinent to question Commissioner Goodell." Ex.D.18. Judge Graves and Judge Crotty reached the same conclusion. Ex.F.9; Ex.C.3.

Indeed, the arbitrator's denial of access to Goodell and Thompson presents a textbook case for vacatur. In *Tempo Shain Corp. v. Bertek, Inc.*, this Court held that an arbitration panel committed "misconduct" in violation of the FAA by refusing to hold the record open until a key witness—who possessed unique knowledge on a central issue—was available to testify. 120 F.3d 16, 20–21 (2d Cir. 1997). The Court concluded that the panel's refusal to allow the absent witness to testify had "no reasonable basis" and "amount[ed] to fundamental unfairness." *Id*. at 21; *see also id.* at 20 ("Pollock . . . was not allowed to testify, and he is *the only person who could have done so*") (emphasis added). That is all the more true here, where one absent witness is the lone accuser, and the other absent witness is the individual who imposed the discipline based on distorted and incomplete facts.

*Finally*, vacatur is also appropriate because Henderson violated the CBA by refusing to have Thompson and Goodell to testify.

Article 46 of the CBA affords players the right to "present, by testimony or otherwise, *any evidence relevant to the hearing*." Art. 46 § 2(b) (Ex.Q) (emphasis added). An arbitration award is "legitimate only so long as it draws its essence from

the collective bargaining agreement." *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Courts must "protect the parties by insuring that the arbitrator acts within the contractually-drawn boundaries outlined in the" CBA. *Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 387 (4th Cir. 2000) (brackets and internal ellipsis omitted). Thus, an arbitration award is invalid if it "ignored the plain language of the" CBA. *Id.*

As Judge Mazzant held, Henderson "breached the CBA" by denying the NFLPA and Elliott "Thompson's cross-examination[] and the examination of Commissioner Goodell" because "each was of utmost importance and extremely relevant to the hearing." Ex.D.8. Henderson *did not hold* that the sought-after evidence was cumulative or irrelevant; instead, he concluded only that it was not "essential to Mr. Elliott's defense," and that Article 46 of the CBA did not "require" it. Ex.P. His rulings thus directly contravened Elliott's CBA-protected right to present "any evidence" that was "relevant" to his defense. Art. 46 § 2(b). His violation of the CBA constituted "misbehavior" that renders the award invalid. 9 U.S.C. § 10(a)(3).

### 2. The District Court's Errors Of Law Independently Establish The NFLPA's Likelihood Of Success On The Merits.

The district court blew right past these precepts. Its analysis of fundamental fairness rests on two undeniable errors of law, both of which give rise to a substantial likelihood of success for the NFLPA on the merits.

*First*, the linchpin of the district court's fundamental fairness analysis was its demonstrably erroneous conclusion that "the CBA does not grant authority, much less require, an arbitrator to compel" an individual to testify. Ex.B.19-20. That is wrong as a legal matter, and cannot be reconciled with the text of the CBA and decisions that construe it.

In Article 46(2)(b) of the CBA, the NFL and the NFLPA bargained for a provision that grants players "the right . . . to present, by testimony or otherwise, *any evidence* relevant to the hearing." Ex.Q (emphasis added). Prior NFL arbitrators— including Commissioner Goodell himself—have interpreted Article 46 to require that players be afforded the opportunity to confront key witnesses, and have accordingly *compelled* witnesses to testify. *See* Ex.U (*Brady* Decision on Hearing Witnesses & Discovery (June 22, 2015)) (compelling Ted Wells); Ex.H.2-3 (*Rice* Order on Discovery & Hearing Witnesses (Oct. 22, 2014)) (Jones, J.); Ex.T (*New Orleans Saints* ("*Bounty*") Pre-Hearing Order No. 4 (Nov. 9, 2012)).

Moreover, the *arbitrator* in this case never determined—or even suggested— that the CBA does not authorize compulsion. *See* Ex.R (Aug. 30) 348:18-349:15; Ex.P.3-4. The district court effectively rewrote the arbitrator's decision and—more problematic—rewrote the CBA *itself* to preclude Article 46 arbitrators from compelling witnesses. Left undisturbed, in every arbitration going forward the NFL will cite the district court's *sui generis* interpretation of the CBA that Article 46

hearing officers do not have compulsory authority even over NFL-affiliated witnesses.

*Second*, the district court further erred in concluding that the arbitration was fundamentally fair despite the fact that NFLPA was denied the opportunity to cross-examine Thompson. That analysis was premised on the district court's same mistaken conclusion that Henderson lacked authority to compel her testimony, as well as its determination that Thompson's testimony would be "duplicative" and "emotionally disturbing." Ex.B.20. But once again, that conclusion is the product of the district court's own surmise. The arbitrator made *no* determination that Thompson's testimony would have been "cumulative" or "emotionally difficult." Instead, he (wrongly) concluded that her testimony was not "essential" to Elliott's defense. Ex.P.3-4 (emphasis added).

What's more, "the NFL *did not even ask* Thompson to testify," and "there is nothing in the record to suggest that she was unwilling to testify at the arbitration hearing." Ex.D.13 n.6 (emphasis added). After all, "Thompson was cooperative throughout the entirety of the NFL's investigation," *id.*, voluntarily agreeing to six interviews and providing the NFL with numerous photographs, hundreds of text messages, and access to two of her cellphones. *See* Ex.K1-2. Henderson's refusal even to ask Thompson to testify thus deprived the NFLPA and Elliott of the

20

opportunity to produce evidence that is indisputably "pertinent and material" to this case.  9 U.S.C. § 10(a)(3).

## III.    The Public Interest Favors An Injunction Pending Appeal.

Finally, the public interest supports enjoining employee discipline that results from a fundamentally unfair arbitration.  The "public interest favors an injunction" where it is needed to maintain the status quo until a determination on the merits is made, where no critical public interest would be harmed, and where the enjoined party can be effectively vindicated after a trial on the merits.  *SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399, 405 (S.D.N.Y. 1999). Preserving the status quo here would benefit many constituents, including NFL players and the NFL, as well as anyone subject to an arbitration provision, and it would not harm any critical public interest.

*        *        *

Arbitration serves a vital function in our civil justice system and in labor relations.  But arbitration must have a modicum of integrity.  While it is no doubt true that the Commissioner has discretion under Article 46, he has no bargained-for authority to ruin lives and careers in violation of CBA rights and the bedrock safeguards of the arbitral process.  Serious legal questions exist about whether "[f]undamental unfairness [was] present throughout the entire arbitration process." Ex.D.19.  Three federal judges have already concluded it *was* fundamentally unfair.

21

Courts retain authority under the LMRA to curb abuses of the arbitral process, and this Court should vindicate that authority here.

## CONCLUSION

For the foregoing reasons, the NFLPA respectfully requests that this Court grant an injunction pending appeal and expedite this appeal. Alternatively, this Court should enter a brief administrative stay for consideration of this motion so that Mr. Elliott can participate in the scheduled game on Sunday, November 5, 2017.

Date: November 1, 2017                    Respectfully submitted.


  /s/ Andrew S. Tulumello

Rebekah Perry Ricketts                    Andrew S. Tulumello
GIBSON, DUNN & CRUTCHER LLP                 *Counsel of Record*
2100 McKinney Ave., Suite 1100            Thomas H. Dupree, Jr.
Dallas, TX 75201                          Christopher J. Baum
(214) 698-3100                            Jason E. Neal
                                          Lochlan F. Shelfer
Jeffrey L. Kessler                        GIBSON, DUNN & CRUTCHER LLP
David L. Greenspan                        1050 Connecticut Ave., N.W.
WINSTON & STRAWN LLP                      Washington, D.C. 20036
200 Park Avenue                           (202) 955-8500
New York, NY 10166                        atulumello@gibsondunn.com
(212) 294-6700
                                          DeMaurice F. Smith
Steffen N. Johnson                        NATIONAL FOOTBALL LEAGUE
WINSTON & STRAWN LLP                        PLAYERS ASSOCIATION
1700 K Street, N.W.                       1133 20th Street, N.W.
Washington, D.C. 20006                    Washington, D.C. 20036
(202) 282-5000                           (202) 756-9136

*Counsel for National Football League Players Association*
*and Ezekiel Elliott*

23

## CERTIFICATE OF COMPLIANCE

This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 4,961 words, as determined by the word-count function of Microsoft Word 2010.

Dated:      November 1, 2017        /s/ Andrew S. Tulumello
                                             Andrew S. Tulumello

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2017, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.


    /s/ Andrew S. Tulumello
Andrew S. Tulumello